**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

JASON BROWN, DANIEL STADELMANN, LYNN BROWN and ROBERT L. BROWN,       ) ) ) ) )   Case No. 2:23-cv-00554 (RAL)

Plaintiffs, )

v. )

POWER BLOCK COIN, LLC d/b/a SMARTFI and AARON TILTON, )

Defendants. )

## SECOND AMENDED COMPLAINT

Plaintiffs file this Second Amended Complaint against defendants, Power Block Coin LLC d/b/a SmartFi and Aaron Tilton and, in support thereof, aver as follows:

## PARTIES

1.    Plaintiff, Jason Brown, is a Pennsylvania citizen living in North Huntingdon, Pennsylvania, United States of America.

2.    Plaintiff, Lynn Brown, is a Pennsylvania citizen living in North Huntingdon, Pennsylvania, United States of America.

3.    Plaintiff, Robert L. Brown, is a Pennsylvania citizen living in North Huntingdon, Pennsylvania, United States of America.

4.    Plaintiff, Daniel Stadelmann, is an Austrian citizen living in the Netherlands.

5.    Defendant, Power Block Coin LLC d/b/a SmartFi ("SmartFi"), is a Utah limited liability company having a business address at 1145 South 800 East, Suite 117, Orem, UT 84097. SmartFi is wholly owned by Blue Castle Holdings, Inc., a Delaware corporation. Blue Castle Holdings, Inc. is not a publicly held company.  Blue Castle Holdings, Inc. has a Utah

116303315

business address.

6.      Defendant, Aaron Tilton, is a Utah resident and the CEO and President of
SmartFi, with a business address of 1145 South 800 East, Suite 117, Orem, UT 84097.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction per 28 U.S.C. § 1332(a)(2) because the
parties are of diverse citizenship and the amount in controversy exceeds $75,000 and under 28
U.S.C. § 1331, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa because the case arises under Federal
securities law.

8.      The Court further has supplemental subject matter jurisdiction because certain
claims are so related to claims in this action within the Court's original jurisdiction that they
form part of the same case or controversy. 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction and venue is proper in this District per 15
U.S.C. § 78aa(a) and 15 U.S.C. § 77v(a) because defendants are citizens of the United States and
some or all of the acts and transactions in which defendants engaged and that constitute
violations of the federal securities laws occurred in or were directed to citizens of this District.

10.     Venue is further proper under 28 U.S.C. § 1391 because a substantial part of the
events or omissions giving rise to the claim occurred in this District.

11.     This Court also has jurisdiction because some or all of the defendants engaged in
conduct within the United States that constituted significant steps in furtherance of the violations
of the Federal securities laws averred in this complaint. This included advertising securities for
sale and processing purchases on SmartFi.com along with multiple conversations and
communications, including e-mails and video calls, directed to this District.

12.     This Court also has jurisdiction and venue is proper because defendants made

116303315

false and misleading statements to investors residing in this District and marketed and sold securities to investors residing in this District through the SmartFi.com website to residents of this District. SmartFi.com is a fully interactive website through which users can research SmartFi and its SMTF cryptocurrency token, request loans from SmartFi, purchase SMTF tokens, and buy and sell cryptocurrency on various SmartFi exchanges. On that website, SmartFi falsely represented that its SMTF tokens were sold with a buy back guarantee and it directed communications to residents of the District, stating that its lending structure meant SmartFi would always be able to return a customer's investment.

13.    In connection with the conduct averred in this complaint, defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange, namely through defendants' use of the Internet when engaging in the acts and transactions described herein.

<strong><u>FACTS</u></strong>

**A.    <u>Background.</u>**

14.    Jason Brown and Daniel Stadelmann are software developers who specialize in blockchain and cryptocurrency technology.

15.    In 2020, SmartFi retained an entity with whom they have a relationship to perform coding work for SmartFi, including developing its blockchain systems.

16.    SmartFi offers loans in which borrowers receive money from SmartFi in exchange for posting cryptocurrency, including Bitcoin, as collateral.

17.    SmartFi advertised that it would begin to sell SmartFi tokens called "SMTF" to the public and that these tokens were designed to be "speculative" and tied to SmartFi's success.

3

18.    SmartFi stated that it would raise funds by selling SMTF tokens to customers in exchange for USDC stablecoin or United States Dollars.

19.    Thus, SmartFi raised money from users by selling SMTF and loaned that money to borrowers, whom it charged interest.

20.    Because of the representations made by SmartFi — chiefly by its founder and CEO Aaron Tilton — plaintiffs believed in the SmartFi technology and its potential success.

21.    Jason Brown and Daniel Stadelmann had several conversations with SmartFi personnel regarding purchasing SMTF tokens in 2021.

22.    Defendants promised Jason Brown and Daniel Stadelmann that the tokens were safe, and that SmartFi had a built-in "hedge" so that SMTF's value would not drop like other cryptocurrencies.

23.    Jason Brown and Daniel Stadelmann understood that SmartFi's structure meant that SMTF was not exposed to the same risks that Bitcoin or other cryptocurrencies were exposed to.

24.    Jason Brown and Daniel Stadelmann heard from Tilton on multiple occasions that SmartFi was built with "safety first" and that the value of SmartFi tokens would not be exposed to the same fluctuations as other cryptocurrencies.

25.    SmartFi and Tilton stated on several occasions to Jason Brown and Daniel Stadelmann that, even if the price of SMTF did fall, investors could always invoke the buy back guarantee to get their initial investment back.

**B.    SmartFi advertises SMTF and its 100% buyback guarantee to the general public, including Plaintiffs.**

26.    In September of 2021, SmartFi began selling SMTF tokens.

27.    Defendants promised in presentations, webcasts and conversations that the

4

purchase of SMTF tokens came with a "100% buyback guarantee."

28.    Defendants promised that, if SMTF was purchased from SmartFi in United States Dollars or a United State Dollars denominated stablecoin, and held for 12 months, the SMTF tokens could be returned by investors to SmartFi for a full refund.

29.    Defendants repeated that SMTF tokens were "safe" and that the refund was a "hedge" against downside risk that other tokens did not offer.

30.    Plaintiffs believed that their investment in SmartFi would, if requested, be fully refunded by SmartFi and, therefore, they would be able to get their investment back even if SMTF's value did not appreciate.

31.    Plaintiffs were told that, because SmartFi was not publicly traded and investments were not used to support operations, their invested principal would not be exposed to market risks.

32.    During a SmartFi Community AMA on October 20, 2022, Martin Tillier, SmartFi's Head of Research said regarding the buy back guarantee: "Legally I probably shouldn't say this, but it basically reduces my market risk to zero percent."

33.    Tillier later stated that the 100% buy back "effectively reduces your downside to zero."

34.    Tilton commented that the buy back guarantee gives buyers both speculation and "safety in a single asset."

**C.    SmartFi explains and reiterates its promised buy back guarantee in multiple presentations and videos.**

35.    During an August 17, 2021 digital panel discussion including Tilton, Jason Brown, and Daniel Stadelmann, Tilton stated that a person can redeem his or her purchased SMTF tokens for their original purchase price at any time after holding them for one year.

116303315

36.    Tilton stated that the buyback allows SMTF token holders to either get all of their money back or hold the "speculative value of the token."

37.    He reiterated that the SMTF token was a hedge for "safety" to get back the original monies used to purchase SMTF.

38.    Tilton emphasized that SMTF was built to start with safety and then provide for "speculation."

39.    Tilton represented, in response to a question, that SmartFi was not vulnerable to a "bank run" like traditional institutions.

40.    Tilton represented that, because of SmartFi's "core economic design" and SmartCycle system, SmartFi only raises capital when there is a demand for loans.

41.    Tilton claimed that the SmartCycle system involves raising funds at increasing SMTF prices along with increasing loan demand. This meant SmartFi was "always sitting on the cash" and "that's how we can do a buyback guarantee, we'll always have the cash available."

42.    In a virtual Townhall meeting on September 16, 2021, Tilton reiterated that there is a 100% buyback guarantee for SMTF tokens, at the same price paid, after one year.

43.    Plaintiff Jason Brown attended that virtual Townhall meeting.

44.    Tilton stated during a PirateChain webcast in September 2021 — which was attended by Jason Brown prior to his purchase of SMTF — that purchasers would have the choice of getting their money back or the speculative value of the token.

45.    Tilton claimed that SMTF would be tied to the notional value of SmartFi's loan portfolio and would stay "in balance."

46.    Tilton explained the buy back guarantee as giving the SMTF holder the option of getting their money back after one year or keeping the "speculative value of the token."

116303315

47.     Tilton also claimed that SMTF was not a "security" within the meaning of United States federal securities laws and that, accordingly, SmartFi did not need to register SMTF with the Securities and Exchange Commission ("SEC") and SmartFi did not plan to register SMTF with the SEC.

48.     At the same time, Tilton noted that the market price for SMTF was "low" and that it was a "good opportunity to buy" and then sell for a higher price later when the price went up.[1]

49.     After investing over $17 million in an illiquid real estate deal in March 2022, as described in more detail below, SmartFi still maintained that it would always be able to pay buy back claims as they came due.

50.     During a SmartFi Live AMA on July 14, 2022, Tilton claimed SmartFi would return "exactly what you bought [SMTF] for."

51.     Tilton also promised that SmartFi would have the liquidity to meet the buy back guarantee: "[N]eeding liquidity for defi projects, really it just all goes into our loan portfolio and that's what guarantees or backs the floor or the buy back guarantee of your original purchase price . . . ."

52.     As recently as February 16, 2023, during a livestream on SmartFi's YouTube page, Tilton maintained that the SMTF token is not a security because SmartFi does not pay interest on the token.[2]

53.     Upon information and belief, Tilton owns all of SmartFi's stock and all sales accrue to his benefit.

       **D.     SmartFi repeatedly represents in writing that there is a buyback guarantee.**

---

[1] *Id.* at 25:55.
[2] SmartFi, *Crypto Interest Accounts & SMTF – Tilton Talks Crypto Episode 19* at 25:05, YouTube (Feb. 16, 2023), https://www.youtube.com/live/C2f7AX4k-Ws?feature=share.

116303315

54.     SmartFi repeatedly represented to potential investors, in public media and forums held on the Internet, that they could return their purchased tokens for a full refund after 12 months for any reason at all.

55.     SmartFi stated: "We will buy back your SmartFi token for the original purchase price if you are unhappy with the it after one year. No matter what the reason."[3]

56.     SmartFi promised that SMTF was less risky than alternatives:[4]



UNLEASHING THE TRUE POTENTIAL OF CRYPTOCURRENCY

- Combines The Best of Both Worlds
- Cryptocurrency ROI
- Less Risk – 100% Buy Back Guarantee*
- Resist Bear Market Volatility - A maximalist cryptocurrency backed by fundamentals.

57.     SmartFi stated that its loan portfolio could grow to one billion dollars, meaning each SMTF token would be worth $106 using SmartFi's "Forward Price Index."[5]

58.     SmartFi touted this "Forward Price Value" system, under which additional "tranches" of SMTF tokens would be sold at increasing valuations.

59.     SmartFi promised that SMTF tokens would be sold to fund loans on the SmartFi platform, and that as demand for loans grew, SMTF would be sold at higher prices to fund the loans.

60.     Thus, those who purchased tokens early would be able to sell at higher prices because SMTF's price would continue to rise.

61.     SmartFi wrote that, through this system, it could guarantee a buyback to investors

---

[3] SmartFi, *Better than Owning a Bank, 2021 Pitch Deck* at 7, https://smartfi.com/pitchdeck (last visited March 20, 2023).
[4] *Id. at 2.*
[5] *Id.* at 14.

116303315

after one year:[6]

**100% BUY BACK GUARANTEE**

FUNDAMENTAL LOAN PORTFOLIO INDEXES SMARTCYCLE

- We will buy back your SmartFi token for the original purchase price if you are unhappy with the it after one year. No matter what the reason.

- SmartFi has fundamentals AND Speculation safety of $ denominated hedge.

- Proceeds from SmartCycle TOKEN is NOT used for software development – Only used to fund the Open Lending Platform Loans

- SmartFi has its own CeFi and DeFi exchanges to support its trading and distribute SmartFi Token

62.     In addition, SmartFi represented that it would fund loans with the money collected selling SMTF, then collect interest on those loans, and use that interest to buyback SMTF tokens.[7]

63.     In its White Paper, SmartFi again touted its "on-chain hedge" and risk reduction strategy.[8]

64.     SmartFi now advertises that SMTF tokens are selling for $4.14 and will continue to sell for more over time under its "Current SmartCycle Pricing."[9]

65.     SmartFi also continues to imply that the price of SMTF will climb because it has issued $19.83 million in loans, but there is currently demand for $30.01 million in loans,

---

[6] *Id.* at 7.
[7] *Id.* at 13-14.
[8] SmartFi, *More Than a White Paper* V1.1. at 25 (Jan. 3, 2023) https://smartfi.com/whitepaper.
[9] SmartFi, *Tokenomics*, https://smartfi.com/tokenomics (last visited June 14, 2023).

116303315

meaning more SMTF will be sold to meet demand.[10]

        **E.**        **Plaintiffs Lynn and Robert L. Brown research SmartFi before purchasing.**

       66.      Plaintiffs Lynn and Robert L. Brown are plaintiff Jason Brown's parents and learned about SmartFi's products through their son's software development work on the platform for a company which had a contract with SmartFi.

       67.      Lynn and Robert L. Brown researched SmartFi before investing by reviewing SmartFi's website and materials.

       68.      SmartFi offered its tokens to Mr. and Mrs. Brown, Pennsylvania residents, through its interactive website at SmartFi.com.

       69.      SmartFi's website offered SMTF for sale and advertised the benefits of holding the token and the SmartFi platform.

       70.      SmartFi's website also allowed customers to purchase SMTF Tokens directly from SmartFi and advertised several exchanges where investors could sell their tokens.

       71.      SmartFi states on its website that it is a "USA Money Service Business," registered with United States agencies including the Financial Crimes Enforcement Network.[11]

       72.      Lynn and Robert L. Brown also reviewed the social media profiles of Mr. Tilton available on the Internet.

       73.      Lynn and Robert L. Brown watched video presentations by SmartFi, including videos featuring its founder, Aaron Tilton.

       74.      Lynn and Robert L. Brown expected to receive their money back after 12 months and the specifically invested because they did not want their investment to be at risk of loss in value like other cryptocurrencies.

---

[10] SmartFi, *Tokenomics*, https://smartfi.com/tokenomics (last visited June 14, 2023).
[11] SmartFi, *Get Started*, https://smartfi.com/get-started (last visited March 21, 2023).

116303315

F.    **Plaintiffs Lynn and Robert L. Brown purchase SMTF from SmartFi.**

75.    On or about September 28, 2021, Lynn Brown and/or her son Jason, both residents in this District, contacted SmartFi employees by phone to discuss creating an account for her and her husband and purchasing SMTF tokens.

76.    On September 28, 2021, Lynn and Robert L. Brown wired $10,000 to SmartFi from their account located at their Citizen's Bank branch based in this District in North Huntington, Pennsylvania.

77.    On September 29, 2021, in exchange for their $10,000, Lynn and Robert L. Brown received 7,751.94 SMTF tokens from SmartFi.

78.    On January 4, 2023, after waiting for 12 months, Lynn Brown and Robert Brown invoked the buyback guarantee to have their money returned to their bank account.

79.    Over a year has passed, however, and SmartFi has not honored the Browns' buyback request.

80.    On March 7, 2023, SmartFi removed SMTF from the Browns' account, and instead credited them with an illiquid "Buy Back Balance" token instead of the money they wired to SmartFi to purchase SMTF.

81.    Lynn and Robert L. Brown were never asked by SmartFi whether they would accept a Buy Back token in lieu of return of their invested funds.  Further and as a consequence, Lynn and Robert L. Brown never agreed to receive an illiquid Buy Back Balance token, which was never advertised as an alternative to return of their invested funds when they purchased their SMTF in 2021.

82.    Upon information and belief, SmartFi did not announce the Buy Back Balance token until February of 2023, after Lynn and Robert L. Brown had waited over one year from purchasing their SMTF tokens and after they submitted their buyback requests.

116303315

83. SmartFi has stated that it will pay accounts holding Buy Back Balance tokens in United States Dollars or USDC stablecoin and reduce their Buy Back Balance, but has given no indication of if, and when, Lynn and Robert L Brown will receive their investment back in full.

84. This is despite the fact that SmartFi previously and continuously represented to Lynn and Robert L. Brown, and other investors, that SmartFi's 100% buy back guarantee was iron clad and that its Forward Price Index would prevent a bank run.

### G. **Plaintiffs Jason Brown and Daniel Stadelmann purchase SMTF.**

85. Jason Brown and Daniel Stadelmann had several discussions with SmartFi employees leading up to purchasing the SMTF tokens and were repeatedly promised that there was a buyback guarantee on their purchase.

86. Defendants specifically solicited Jason Brown to purchase SMTF tokens through e-mails, phone calls, and web calls directed to this District.

87. Jason Brown and Daniel Stadelmann spoke with both Aaron Tilton and SmartFi Chief Operating Officer, Thomas Retson, about purchasing SMTF tokens.

88. Jason Brown and Daniel Stadelmann understood, through conversations with Tilton and Retson, that they were buying SMTF from the primary market because they were buying direct from SmartFi.

89. Jason Brown, Stadelmann, and representatives of SmartFi had a standing Zoom call on Mondays in 2021 and 2022, during which they discussed the SmartFi software development work and later Jason Brown and Stadelmann purchasing SMTF.

90. Jason Brown and Stadelmann specifically asked during those conversations with Aaron Tilton whether their purchase of SMTF would qualify for the 100% buyback guarantee and were told by that it would qualify.

116303315

91.    Jason Brown and Stadelmann were told by Tilton personally that their $1,858,261.46 investment would be subject to the SmartFi buyback guarantee.

92.    Jason Brown and Stadelmann understood that they would receive SmartFi's "100% buyback guarantee" and that, one year after their purchase of SMTF tokens, they could receive a full refund of their investment if requested by them.

93.    Jason Brown and Stadelmann worked directly with SmartFi to execute the transaction using the SMTF token on the Binance Smart Chain blockchain.

94.    Jason Brown and Stadelmann worked directly with David Aguirre, SmartFi's Project Manager, to make the transaction because he had expertise in the atomic swap technology.

95.    Jason Brown and Stadelmann worked directly with Aguirre and SmartFi COO Retson to execute an atomic swap sending USDC (a digital dollar, also known as stablecoin) in exchange for SMTF based on the express promise Jason Brown and Stadelmann would be eligible for the buyback guarantee in October of 2022.

96.    On October 12 and 13, 2021, they sent $1,858,261.46 worth of USDC stablecoin to SmartFi in exchange for SMTF tokens.

97.    They purchased SMTF for 70 cents per token.

98.    On January 1, 2023, SMTF was worth 63 cents per token.

99.    Today, SMTF is worth less than one cent per token.

100.   Plaintiffs were led to believe that their principal investment was safe, and while they may not earn interest on it, they could at least always get back the total amount they paid to purchase SMTF after waiting for one year after the date of the purchase to make a request for the return of their investment.

13

101.     After waiting for over one year from the date of purchase of SMTF tokens, on

January 9, 2023, they requested their $1,858,261.46 in USDC stablecoin back, however SmartFi

has ignored and/or refused their request.

102.     Jason Brown and Stadelmann have repeatedly contacted SmartFi, and its founder

Aaron Tilton, to request a buyback of their SMTF tokens, but their buyback requests have been

ignored and/or refused.

**H.     SmartFi invests in illiquid real estate and engages in self-dealing with
affiliated companies using investors funds.**

103.     In March of 2022, despite promising that it would "always have the cash,"

SmartFi invested in a real estate project in Washington County, Utah through an unsecured

promissory note that would not be paid back for a decade.

104.     On March 22, 2022 SmartFi loaned $17.4 million of its customers' and investors'

money to an entity called SmartFi Toquerville LLC.

105.     SmartFi CFO Brad Jones signed the promissory note on behalf of SmartFi, while

Defendant Aaron Tilton — also SmartFi's CEO — signed the note on behalf of SmartFi

Toquerville LLC.

106.     The money was immediately transmitted to a third party, Zions Landing LLC, a

Wyoming LLC represented by Frank Tusieseina.

107.     The money was then given to The Wright Direction LLC in exchange for a 200–

acre parcel of land.

108.     There was a separate promissory note between SmartFi Toquerville LLC and

Zions Landing LLC, which provided a six-month bridge loan to Zions Landing under which

Zions Landing would pay back the $17.4 million in principal and $3 million in interest by

September 2022.

116303315

109. Payment was never made, Zions Landing immediately fell behind on interest payments given the 35% interest rate and short turnaround time.

110. By the end of 2022, SmartFi Toquerville foreclosed on the 200-acre parcel and now owns the land.

111. Zions Landing still owes SmartFi Toquerville over $14 million, even after SmartFi Toquerville foreclosed on the land.

**I.    The transaction was fraudulent, rife with self-dealing, and no due diligence was performed.**

112. The $17.4 million purchase involved no diligence and Zions Landing defaulted within weeks of SmartFi originating the loan.

113. SmartFi CFO Brad Jones claimed that the only document he reviewed before loaning millions of dollars of investor money to SmartFi Toquerville — a company owned and controlled by Blue Castle Holdings, which Tilton and Jones serve on the board of — was reading an appraisal report that valued the land at only $9 million.

114. Tilton testified that he hired a man named Doug Towler to perform due diligence on the purchase in February and March 2022.

115. After Zions Landing defaulted, and SmartFi Toquerville had to foreclose on the land, Tilton again hired Towler to oversee the development of the land.

116. As far as his own diligence process, Tilton was unaware whether the Doug Towler that he relied on and hired was the same Doug Towler who, upon information and belief, was indicted for real estate fraud in federal court in Arizona in 2009. *See* Indictment, *United States v. Hamblin Slade et al.*, 2:09-cr-01492-EHC, Dec. 2, 2009.

117. Nor did Tilton or SmartFi investigate Zions Landing LLC.

118. Zions Landing LLC is a Wyoming LLC with a registered agent address of 30 N

116303315

Gould St STE N, Sheridan, WY 82801.

119.    Zions Landings' registered agent is one that, upon information and belief, the local media has identified as being used by fraudsters.[12]

120.    Tilton and Jones were further unaware whether the Frank Tusieseina who represented Zions Landing LLC was, upon information and belief, the same Frank Tusieseina who was in bankruptcy when SmartFi Toquerville funded the land purchase. *See In re Frank L. Tusieseina vs. Sports World Event Center, LLC*, Case 19-28621 (Bankr. D. Utah).

121.    Upon information and belief, a Frank Tusieseina has been the subject of other bankruptcy filings, including in 2013, 2017, 2018 and also going back to the 1990s.

122.    Nor were Tilton or Jones aware whether, upon information and belief, the Frank Tusieseina sued for fraud in the above proceeding was the man they had done business with. Complaint to Determine Dischargeability of Debt, Feb. 25, 2020, Case 19-28621, ECF No. 18 (Bankr. D. Utah).

123.    That Complaint was filed by Brian M. Rothschild of Parsons Behle & Latimer; his colleagues represent SmartFi and Tilton in this matter and Mr. Rothschild represents SmartFi and Tilton in other ongoing matters.

124.    Further, SmartFi Toquerville is now in litigation over this same purchase in Utah state court and has pleaded facts that undermine its diligence process. *See* Answer, Counterclaim, Cross-Claim and Third-Party Complaint, *The Wright Direction LLC v. Zions Landing Development Group, LLC and SmartFi Toquerville, LLC*, Civil No. 230500055, Fifth Judicial

---

[12] Ashleigh Snoozy, *Another scam recorded from business related to 30 N. Gould St registered agent*, The Sheridan Press (Aug. 6, 2021), https://www.thesheridanpress.com/news/local/another-scam-recorded-from-business-related-to-30-n-gould-st-registered-agent/article_52b040ca-f622-11eb-a595-e7f2de685e62.html.

116303315

District Court, Washington County, State of Utah, June 14, 2023.

125.    In that litigation, SmartFi Toquerville pleaded that the 200–acre parcel it paid more than $17 million for in 2022 was part of a larger, 600 acre parcel that sold in 2021 for only $19 million. *Id.* Counterclaim ¶ 16.

126.    SmartFi Toquerville also pleaded that the 200-acre parcel it paid $17.4 million for had a fair market value of "less than $6,500,000 as of March 17, 2022." *Id*. Counterclaim ¶ 28.

127.    SmartFi Toquerville pleaded that the counterclaim defendant committed fraud by selling the parcel for more than its fair market value. *Id.* Counterclaim ¶¶ 89-107.

128.    And SmartFi Toquerville pleaded that Zions Landing owes at least $14 million under the note, even after the foreclosure. *Id.* Counterclaim ¶ 57.

129.    At the very least, SmartFi Toquerville, Aaron Tilton, and SmartFi recklessly disregarded the risks of the purchase and the deficiencies in their due diligence process led to them squandering investor funds.

**J**      **Tilton also extended an interest free loan from SmartFi to parent company Blue Castle Holdings, which paid Tilton's salary.**

130.    Both SmartFi CFO Brad Jones and CEO Aaron Tilton confirmed that SmartFi extended a $2.1 million "loan" to parent company Blue Castle Holdings.

131.    Both Tilton and Jones are on the board of Blue Castle Holdings and receive salaries from Blue Castle Holdings.

132.    Neither Jones nor Tilton could recall the terms of the $2.1 million loan, such as the interest rate, term, or maturity date.

133.    Further, the loan has never been memorialized and the terms remain unknown.

134.    Jones, however, recalled that SmartFi has never received a payment on the loan.

116303315

135.    Making a loan from SmartFi to parent company Blue Castle using SmartFi customer funds — including money raised from selling SMTF to investors like the Plaintiffs — is self-dealing solely to enrich Blue Castle and Tilton at the expense of SmartFi and its investors.

**K.    SmartFi is not honoring other investor's buy back requests and is in financial distress.**

124.    All four plaintiffs do not believe that SmartFi has sufficient liquidity to meet investor buy back requests based on information exchanged in chatrooms and servers and documents and presentations authored by SmartFi.

125.    During a livestream on February 2, 2023, Tilton himself said that SmartFi was expanding the "duration of the buy back guarantee" to be better linked to the "liquidity in the project."

126.    Tilton's co-host and head of research for SmartFi, Martin Tillier, commented that this was a "change of tack" for SmartFi.

127.    During another livestream on February 16, 2023, Tilton admitted that SmartFi was "less liquid" given its investments in equipment loans and real estate.

128.    He explained that the BBB program was SmartFi's attempt to "protect liquidity."

129.    SmartFi's own Tokenomics webpage tracks its "Smartloan Portfolio Liquidity."[13]

130.    As of May 19, 2023, SmartFi only had $7,876 on hand to pay buy back requests for May 2023.

131.    It is unlikely that SmartFi will raise additional funds selling SMTF because SmartFi is charging $4.14 cents for tokens on its website while tokens are available on the secondary market for less than a penny.

132.    In addition, there is a federal District Court action filed in Utah involving SmartFi

---

[13] SmartFi, *Tokenomics*, https://smartfi.com/tokenomics (last visited May 19, 2023).

116303315

as a party in which a customer of SmartFi, Zhouyang Song, has brought claims against SmartFi for, among other things, breach of contract, unjust enrichment, breach of implied covenant, fraud, conversion, trespass to chattel and declaratory and injunctive relief.  Defendant's Original Answer and Counterclaims, *Power Block Coin, LLC v. Zhouyang Song,* C.A. No. 2:23-cv-175 (U.S. Dist. Ct. for the Central Division of Utah) (ECF No. 5).

133.    In his pleading, Mr. Song avers that he posted collateral of 433.9274 Bitcoins worth more than $25 million with SmartFi and, in turn, borrowed $4,378,094.40 from SmartFi.

134.    According to Mr. Song and despite repeated efforts, SmartFi has not, and will not, allow him to pay off his loan in full in cash to get his BTC back from SmartFi, nor will SmartFi elect to sell his collateral to cover the cost of his loan and release the remaining collateral back to him.

135.    Mr. Song has averred that, based on his extensive past dealings with SmartFi, he fears that SmartFi does not have the assets to return to him his invested Bitcoin.

136.    On June 7, 2023, Judge Tena Campbell of The United States District Court for the District of Utah held a hearing on Mr. Song's preliminary injunction and heard argument from both parties.

137.    She asked counsel for SmartFi: "Why doesn't your client simply sell some of the collateral and return the excess?"

138.    In addition, SmartFi changed the terms of the buy back guarantee in February 2023 and no longer promises to immediately return investor funds.

139.    SmartFi is now trying to settle claims with over 100 individual creditors whom it owes a buy back guarantee, the collateral taken in to secure loans, or money deposited with the company as part of its SmartInterest program.

140.    As of today, SmartFi owes roughly $55,000,000 to creditors.

116303315

141.    This does not include $8,000,000 that Celsius Network is trying to recover from SmartFi through its bankruptcy proceeding.

142.    Per SmartFi's own financial statements, it has less than $35,000,000 in assets.

143.    And the largest "asset" that SmartFi owns is the unsecured promissory note it holds on the Washington County, Utah real estate project that, as outlined above, faces major setbacks and is the subject of its own litigation.

144.    Plaintiffs have learned that SmartFi and Tilton may have spent their funds on personal expenses or company activities and not on the loan portfolio as promised.

145.    After Plaintiffs invested, SmartFi became an official sponsor of Supercross racing.[14]

146.    Per Tilton, he and his son have been riding Supercross for years and it is their personal hobby.

147.    In an interview in January 2022, Tilton described himself as a Supercross fan and racer and explained that he was excited about the "access" he had a result of SmartFi's sponsorship.

148.    Tilton himself contacted Supercross and pitched SmartFi being a sponsor.

149.    Several SmartFi employees and consultants told Tilton that the Supercross sponsorship was not likely to be profitable and that it should not be pursued.

150.    Tilton went forward with the sponsorship despite his employees' objections.

151.    SmartFi spent $600,000 on the Supercross sponsorship and then another $75,000 in incidental expenses to travel to events and perform marketing activities.

152.    As part of the sponsorship, SmartFi also gave away thousands of dollars to a

---

[14] SmartFi, *Supercross AMA Championship Official Sponsorship*, *available at* https://smartfi.com/supercross (last accessed May 26, 2023).

116303315

Supercross fan as part of a promotion sweepstakes.

153.    Tilton repeatedly told investors that their investments would be used to fund loans, not for operating costs like software development or "buying Ferraris."

154.    For instance, Tilton was on a panel on August 17, 2022, where he promised that "we do not take the money and build technology with it" and because of that SmartFi will "always" have the cash available for buy backs.

155.    But CFO Brad Jones has stated that SmartFi did not separate the funds raised selling SMTF from other company money.

156.    Thus, SmartFi did use investor money to fund its operations despite telling investors that its platform was ready-built.

157.    In addition, Aaron Tilton employs his brothers at SmartFi.

158.    His brothers are not listed on the SmartFi website and their responsibilities are unknown.

159.    Upon information and belief, Sam Tilton was hired into a technical role for which he was not qualified and could not perform his duties.

160.    Despite the fact that SmartFi has minimal revenue and is currently unable to meet its heavily advertised buy back guarantee, it still pays its employees a salary.

161.    Other information regarding SmartFi's spending and loan portfolio is within Defendants' unique knowledge and possession.

162.    Because SmartFi wrongfully failed to register SMTF with any state or federal agency, it has not disclosed its loan book or how it has used investor funds.

163.    SmartFi is unable to meet buy back requests because, despite Tilton's claims that SmartFi is immune from a bank run, SmartFi does not have the assets to meet its investors buy back requests.

21

L.    **The sale by SmartFi of its SMTF tokens constitutes the sale of "securities" under Federal, Utah, and Pennsylvania securities laws.**

164.    SMTF has all the characteristics of a security as defined under the Securities Act. *SEC v. Howey Co.*, 328 U.S. 293 (1946).

165.    Under *Howey*, an investment is a security if it is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301.

166.    Here, SMTF was sold for an investment of money to fund the common enterprise of SmartFi's lending platform.

167.    Plaintiffs were relying on the purported expertise of SmartFi and Tilton in order to make money on their investments.

168.    Tilton represented that SmartFi had a loan underwriting team and also conducted research and credit checks to ensure it was making loans that would be repaid and that would be profitable.

169.    Plaintiffs expected profits for being holders of SMTF because SmartFi represented that the token had "speculative" value and that its price would necessarily increase due to the Forward Price Index employed by SmartFi.

170.    Plaintiffs expected that as SMTF was sold at higher valuations per the Forward Price Index, they would be able to sell their SMTF on the secondary market for more per-token than they paid for it.

171.    Plaintiffs expected that their SMTF would appreciate in value because "SmartFi makes profits when smart token holders profits increase…."[15]

172.    Plaintiffs also expected that SmartFi would use the interest earned on loans to buy

---

[15] SmartFi, *Better than Owning a Bank, 2021 Pitch Deck* at 6, https://smartfi.com/pitchdeck (last visited March 20, 2023).

116303315

back tokens for which redemption requests were made.

173.    SmartFi touted SMTF's upside potential and told investors the price would increase and that that they should expect the price to increase.

174.    For instance, on October 13, 2021, SmartFi e-mailed customers and asked "Did you make 85% on SMTF?" and implied the price would go to the "moon."



175.    To that end and as set forth above, SmartFi and Tilton led all four plaintiffs to believe that their SMTF would grow in value as SmartFi grew its loan portfolio based, among other things, on SmartFi's "Forward Price Index."  As demand for such loans grew, SMTF

23

would, according to SmartFi and Tilton, be sold at higher prices to fund the loans.

176.    SmartFi's overall messaging, thus, clearly touted the growth potential of SMTF and constituted an economic inducement to all plaintiffs and others to invest in SmartFi's digital token. As such, the sale of SMTF tokens constitutes the sale of securities under Federal, Pennsylvania, and Utah securities law, contrary to SmartFi and Mr. Tilton's prior representations to plaintiffs and to the world.

## COUNT I

## Breach of the Buyback Agreement against SmartFi

177.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

178.    The elements of breach of contract are: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resultant damages.

179.    Plaintiffs agreed to buy SMTF tokens subject to a 100% buyback guarantee.

180.    SmartFi promised to buy back the tokens after 12 months for 100% of the purchase price for any reason.

181.    Despite repeated buy back requests made after 12 months had passed, plaintiffs have not received any of their funds back as SmartFi has refused to honor their requests.

182.    SmartFi's refusal to pay back to plaintiffs their investment constitutes a breach of contract which has proximately caused damages to plaintiffs in the amount of $1,868,261.46.

WHEREFORE, plaintiffs demand judgment in their favor and against SmartFi for an amount in excess of $75,000, plus costs, interest, and such other and further relief as this Court deems just and proper.

116303315

## COUNT II

### Fraud in the Inducement against SmartFi and Tilton

183.    Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

184.    The elements of fraud are (1) a misrepresentation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

185.    SmartFi fraudulently induced plaintiffs into investing in SMTF tokens as an ultra-safe investment with a guaranteed buy back when SmartFi knew full well the potential that SmartFi could not meet the demands of the buy back guarantees as and when they come due.

186.    Plaintiffs reasonably relied on SmartFi and Tilton's representations as to the ultra-safety of their investments and the absolute protection of a buy back guarantee.

187.    Plaintiff specifically purchased SMTF because defendants represented, as set forth above, that the SMTF was less risky than other cryptocurrencies and the SmartFi system contains built-in hedges, including the buy back guarantee for customers.

188.    SmartFi and Tilton claimed that because SmartFi was not leveraged and use the Forward Price Index, it was not vulnerable to a bank run and resisted volatility.

189.    Plaintiffs relied on these misrepresentations and would not have purchased SMTF but for the buy back guarantee and SmartFi's explanation of the Forward Price Index and its loan strategy.

190.    SmartFi and Tilton made these statements recklessly, wantonly and willfully as they knew that SmartFi was loaning money to third parties, often into illiquid projects, and that

25

SmartFi may well not be able to meet buyback requests particularly if instability developed in the cryptocurrency market and this caused uncertainty or anxiety to investors. Such conduct warrants the imposition of punitive damages on SmartFi and Tilton.

191.    SmartFi and Tilton's fraudulent misrepresentations have proximately caused damages to plaintiffs in the amount of at least $1,868,261.46 because their buy back requests have not been honored.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants for an amount in excess of $75,000, plus punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

## COUNT III

### Negligent Misrepresentation against SmartFi and Tilton

192.    Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

193.    Under Pennsylvania law, negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

194.    SmartFi and Tilton represented and SmartFi would return plaintiffs' investment after one year and that because of SmartFi's Forward Price Curve and investment strategy, it would always be able to meet buyback requests.

195.    Tilton represented in August 2021 that SmartFi was not vulnerable to a bank run due its business strategy.

196.    SmartFi and Tilton should have known that due to SmartFi's financial

116303315

commitments, business strategy, and the illiquidity of its investments that it would not be able to meet buyback requests as they were made.

197.    SmartFi and Tilton made these statements to induce investors, and specifically Plaintiffs, to purchase SMTF.

198.    Plaintiffs justifiably relied on SmartFi's and Tilton's misrepresentations because SmartFi's business model and investments were known to SmartFi and Tilton and were injured when SmartFi refused to meet their buy back requests.

199.    SmartFi and Tilton's fraudulent misrepresentations have proximately caused damages to plaintiffs in the amount of at least $1,868,261.46 because their buy back requests have not been honored.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants for an amount in excess of $75,000, plus costs, interest, and such other and further relief as this Court deems just and proper.

## **COUNT IV**

## **Violation of the 1933 Securities Act, Section 12(a)(2)) against SmartFi and Aaron Tilton**

200.    Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

201.    Section 12(a)(2) of the Securities Act creates a private cause of action against a person who offers or sells a security by means of a prospectus or oral communication that includes a false or misleading statement. 15 U.S.C. § 77l.

202.    The elements of a Section 12(a)(2) violation are:

    a.    An offer or sale of a security

    b.    By the use of a means or instrumentality of interstate commerce

27

    c. By means of a prospectus or oral communication

    d. That includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements, in light of the circumstances under which they were made, not misleading.

203. As set forth above, defendants sold investments which constitute "securities" under the Securities Act.

204. These securities were sold to investors like plaintiffs with a 100% buy back guarantee that SmartFi could not and did not honor.

205. SMTF tokens were sold through SmartFi.com and plaintiffs purchased the tokens using SmartFi technology through the internet.

206. SmartFi and Tilton repeatedly promised that SmartFi would buy back SMTF at the purchase price after one year for any reason.

207. SmartFi and Tilton stated in writing and orally that because of SmartFi's structure and hedging, it was not as volatile or risky as other cryptocurrencies.

208. SmartFi and Tilton stated in writing and orally that SmartFi's Forward Price Index meant that SmartFi would be liquid and able to meet redemption requests.

209. In August of 2021, Tilton specifically promised that SmartFi was not vulnerable to a bank run because its core economic design does not use leverage and that SmartCycle only raises funds when there is demand.

210. These statements were not true, in fact SmartFi does not have the liquidity to meet buy back requests and has not honored plaintiffs' repeated buy back requests.

211. Tilton stated on February 6, 2023, that SmartFi's plan was always to invest in "real world" assets including real estate, which is generally illiquid.

212. Defendants did know or should have known that given its plan to invest in

116303315

illiquid assets, it may not be able to meet buyback requests.

213. Further, Tilton should have known that investing in personal interests, including Supercross, would reduce the liquidity available for the Buy Back Guarantee.

214. And that paying unqualified family members' salaries would further reduce the liquidity available for the Buy Back Guarantee.

215. By reason of the foregoing, Defendants violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77e(c).

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a rescission of the sale by way of return of their principal investment amount, interest, costs and such other and further relief as provided by the statute and/or as determined by the Court.

## COUNT V

### Violation of the Securities Exchange Act Section 10(b) and Rule 10b-5 – Material Misstatements and Omissions SmartFi and Aaron Tilton

216. Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

217. The elements of a Securities and Exchange Act 10(b) claim are:

   a. A material misrepresentation or omission
   b. A connection with the purchase or sale of a security
   c. Scienter
   d. Reliance
   e. Economic loss
   f. Loss causation

218. As set forth above, defendants sold "securities" under the Securities and Exchange Act.

219. These securities were sold to investors like plaintiffs with a 100% buy back

29

116303315

guarantee that they SmartFi could not and did not honor.

220.    SmartFi and Tilton repeatedly promised that SmartFi would buy back SMTF at the purchase price after one year for any reason.

221.    SmartFi and Tilton stated in writing and orally that because of SmartFi's structure and hedging, it was not as volatile or risky as other cryptocurrencies.

222.    SmartFi and Tilton stated in writing and orally that SmartFi's Forward Price Index meant that SmartFi would be liquid and able to meet redemption requests.

223.    In August of 2021, Tilton specifically promised that SmartFi was not vulnerable to a bank run because its core economic design did not include leverage and that SmartCycle only raises funds when there is demand.

224.    These statements were not true, in fact SmartFi does not have the liquidity to meet buy back requests and has not paid plaintiffs' buy back requests.

225.    Tilton stated on February 6, 2023, that SmartFi's plan was to invest in "real world" assets including real estate, which is generally illiquid.

226.    Defendants did or should have known that given its plan to invest in illiquid assets, it may not be able to meet buyback requests.

227.    Further, Defendants should have known that investing in real estate, without any experience, would leave them without the funds needed to meet buy backs.

228.    Further, Defendants investment in an affiliated company without conducting diligence was intended to enrich Defendants at the expense of investors, or at the very least, was recklessly indifferent to the risk that SmartFi would lose the funds.

229.    Further, Defendants' choice to extend an interest-free, undefined loan to parent company Blue Castle Holding was intended to move investor funds from SmartFi and to enrich

116303315

others, including Defendant Tilton.

230.    Defendants intentionally or recklessly engaged in the fraudulent conduct described above.

231.    Plaintiffs relied on these representations when deciding to purchase SMTF and specifically purchased it because SmartFi represented that it was less risky than alternative cryptocurrencies.

232.    Plaintiffs have now lost their investment because SmartFi refuses to or cannot honor their buyback requests.

233.    As such, by engaging in the conduct described above, defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly used and employed devices, schemes and artifices to defraud; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon purchasers of securities.

234.    By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. 240.10b-5(b).

WHEREFORE, plaintiffs demand judgment in their favor and against defendants for a rescission of the sale by way of return of their principal investment amount, interest, costs and such other and further relief as provided by the statute and/or as determined by the Court.

### <u>COUNT VI</u>

**Violation of 70 P.S. §§ 1-401 and 1-501 of the Pennsylvania Securities Act of 1972 against SmartFi and Aaron Tilton for Selling Securities Through Fraudulent and/or Untrue <u>Statements</u>**

235.    Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

116303315

236.    70 P.S. § 1-501 provides that "Any person who: . . . (ii) offers or sells a security in violation of section[] 401 . . . or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security . . . ."

237.    As set forth above, defendants sold "securities" to Plaintiffs in violation of Sections 1-401 and 1-501 of the Pennsylvania Securities Act of 1972.

238.    These securities were sold to investors like plaintiffs with a 100% buy back guarantee that SmartFi could not and did not honor.

239.    SmartFi and Tilton repeatedly promised that SmartFi would buy back SMTF at the purchase price after one year for any reason.

240.    SmartFi and Tilton stated in writing and orally that because of SmartFi's structure and hedging, it was not as volatile or risky as other cryptocurrencies.

241.    SmartFi and Tilton stated in writing and orally that SmartFi's Forward Price Index meant that SmartFi would be liquid and able to meet buy back redemption requests.

242.    In August of 2021, Tilton specifically promised that SmartFi was not vulnerable to a bank run because its core economic design did not include leverage and that SmartCycle only raises funds when there is demand.

243.     Defendants did or should have known that given its plan to invest in illiquid assets, it may not be able to meet buyback requests.

32

244.    Further, Defendants should have known that investing in real estate, without any experience, would leave them without the funds needed to meet buy backs.

245.    Further, Defendants investment in an affiliated company without conducting diligence was intended to enrich Defendants at the expense of investors, or at the very least, was recklessly indifferent to the risk that SmartFi would lose the funds.

246.    Further, Defendants' choice to extend an interest-free, undefined loan to parent company Blue Castle Holding was intended to move investor funds from SmartFi and to enrich others, including Defendant Tilton.

247.    Defendants intentionally or recklessly engaged in the fraudulent conduct described above.

248.    Plaintiffs relied on these representations when deciding to purchase SMTF and specifically purchased it because SmartFi represented that it was less risky than alternative cryptocurrencies.

249.    These statements were not true, in fact SmartFi does not have the liquidity to meet buy back requests and has not honored Plaintiffs' buy back requests.

250.    Tilton stated on February 6, 2023, that SmartFi's plan was always to invest in "real world" assets including real estate which is generally illiquid.

251.    Defendants did or should have known that given its plan to invest in illiquid assets, it may not be able to meet buyback requests.

252.    Plaintiffs relied on these representations when deciding to purchase SMTF and specifically purchased it because SmartFi represented that it was less risky than alternative cryptocurrencies.

116303315

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a return of their principal investment amount, interest, costs and such other and further relief as provided by the statute and/or as determined by the Court.

**COUNT VII**

**Violation of Utah Uniform Securities Act §§ 61-1-1 and 61-1-22 against SmartFi and Aaron Tilton for Selling Securities Through Untrue Statements**

253.    Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

254.    Under Utah law, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" in connection with the offer or sale of a security. Utah Code Ann. § 61-1-1.

255.    As set forth above, defendants sold "securities" to Plaintiffs in violation of Sections 61-1-1 and 61-1-22 of the Utah Uniform Securities Act.

256.    Utah Uniform Securities Act section 61-1-22(4) further provides that control person, such as Tilton are, jointly and severally liable: " Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase are also liable jointly and severally…."

257.    These securities were sold to investors like plaintiffs with a 100% buy back guarantee that SmartFi could not and did not honor.

34

258.    SmartFi and Tilton repeatedly promised that SmartFi would buy back SMTF at the purchase price after one year for any reason.

259.    SmartFi and Tilton stated in writing and orally that because of SmartFi's structure and hedging, it was not as volatile or risky as other cryptocurrencies.

260.    SmartFi and Tilton stated in writing and orally that SmartFi's Forward Price Index meant that SmartFi would be liquid and able to meet buy back redemption requests.

261.    In August of 2021, Tilton specifically promised that SmartFi was not vulnerable to a bank run because its core economic design did not include leverage and that SmartCycle only raises funds when there is demand.

262.    These statements were not true, in fact SmartFi does not have the liquidity to meet buy back requests and has not honored Plaintiffs' buy back requests.

263.    Tilton stated on February 6, 2023, that SmartFi's plan was always to invest in "real world" assets including real estate which is generally illiquid.

264.    Defendants did or should have known that given its plan to invest in illiquid assets, it may not be able to meet buyback requests.

265.    Defendants did or should have known that given its plan to invest in illiquid assets, it may not be able to meet buyback requests.

266.    Further, Defendants should have known that investing in real estate, without any experience, would leave them without the funds needed to meet buy backs.

267.    Further, Defendants investment in an affiliated company without conducting diligence was intended to enrich Defendants at the expense of investors, or at the very least, was recklessly indifferent to the risk that SmartFi would lose the funds.

268.    Further, Defendants' choice to extend an interest-free, undefined loan to parent

35

116303315

company Blue Castle Holding was intended to move investor funds from SmartFi and to enrich others, including Defendant Tilton.

269.    Defendants intentionally or recklessly engaged in the fraudulent conduct described above.

270.    Plaintiffs relied on these representations when deciding to purchase SMTF and specifically purchased it because SmartFi represented that it was less risky than alternative cryptocurrencies.

271.    Plaintiffs relied on these representations when deciding to purchase SMTF and specifically purchased it because SmartFi represented that it was less risky than alternative cryptocurrencies.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a return of their principal investment amount, interest, costs, attorney's fees, treble damages, and such other and further relief as provided by the statute and/or as determined by the Court.

## COUNT VIII

**Violation of 70 P.S. §§ 1-201 and 1-502 of the Pennsylvania Securities Act of 1972
Against SmartFi for Selling Unregistered Securities**

272.    Per Rule 10(c) of the Federal Rules of Civil Procedure, Plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

273.    70 P.S. § 1-201 provides that it is "unlawful for any person to offer or sell any security in this State unless the security is registered under this act, the security or transaction is exempted under section 202 or 203 hereof or the security is a federally covered security."

274.    70 P.S. § 1-502 provides that any person who purchases a security that was required to be registered under section 1-201 may sue "to recover the consideration paid for the security, together with interest at the legal rate from the date of payment…."

36

275.    SMTF tokens are a "security" under Pennsylvania law. See 70 P.S. § 1-102.

276.    SmartFi and Tilton stated to their investors, falsely, that SMTF was not a security and did not need to be registered.

277.    SMTF was indisputably not registered as a security as required by statutes and was offered and sold to plaintiffs without the required disclosures.

278.    The SMTF tokens were not registered with any state or federal regulator and were sold in violation of the Pennsylvania Securities Act of 1972.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a return of their principal investment amount, interest, costs and such other and further relief as provided by the statute and/or as determined by the Court.

## COUNT IX

### Violations of Section 61-1-7 and 61-1-22 of the Utah Uniform Securities Act against Smart and Aaron Tilton for selling unregistered securities.

279.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

280.    The Utah Uniform Securities Act provides that "It is unlawful for any person to offer or sell any security in this state unless it is registered under this chapter…." Utah Code § 61-1-7.

281.    Utah Uniform Securities Act section 61-1-22(1)(b) provides that any "person" may sue in law or equity to recover "to recover the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security…."

282.    Utah Uniform Securities Act section 61-1-22(4) further provides that control

116303315

persons, such as Tilton are, jointly and severally liable: " Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase are also liable jointly and severally…."

283.    The Utah Uniform Securities Act further provides for treble damages and reckless and intentional violations of the law. Utah Code Ann. § 61-1-22(2).

284.    SMTF tokens are a security under Utah law because they are an "investment contract." *See* Utah Code Ann. § 61-1-13.

285.    SmartFi and Tilton stated to their investors, falsely, that SMTF was not a security and did not need to be registered.

286.    SMTF was indisputably not registered as a security as required by statutes and was offered and sold to plaintiffs without the required disclosures.

287.    The SMTF tokens were not registered with any state or federal regulator and were sold in violation of the Utah Uniform Securities Act.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a return of their principal investment amount, interest, costs, attorney's fees, treble damages, and such other and further relief as provided by the statute and/or as determined by the Court.

## COUNT X

### Violation of Section 1-503 of the Pennsylvania Securities Act of 1972
### Against Aaron Tilton

288.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

38

289.    Pennsylvania Securities Act of 1972 section 1-503 provides that "Every affiliate of a person liable under section 501 or 502, every partner, principal executive officer or director of such person … who materially aids in the act or transaction constituting the violation, are also liable jointly and severally…."

290.    Aaron Tilton is the founder and Chief Executive Officer of SmartFi and has overseen its operations.

291.    Tilton regularly represented SmartFi in public appearances and marketed and sold SMTF as SmartFi's CEO.

292.    During SmartFi's 2022 Year in Review presentation, on December 22, 2022, SmartFi's Head of Research, Martin Tillier, stated that Tilton was an industry expert who lent credibility to SmartFi, and if "people believe in [Aaron Tilton] they believe in the project."

293.    As a consequence, Tilton is personally liable for violating Sections 1-201, 1-401, 1-501, and 1-502 of the Pennsylvania Securities Act of 1972.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a return of their principal investment amount, interest, costs and such other and further relief as provided by the statute and/or as determined by the Court.

## COUNT XI

### Violation of Securities Act Section 15 and Securities Exchange Act Section 20(a), Control Person Liability against Aaron Tilton

294.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

295.    Tilton is the Co-Founder and CEO of SmartFi and the President and CEO of Blue Castle Holdings, which is the sole member of SmartFi.  Tilton regularly held himself out as the founder and the leader of SmartFi in both private meetings and in public meetings and

39

116303315

presentations.

296.    During SmartFi's 2022 Year in Review presentation, on December 22, 2022, SmartFi's Head of Research, Martin Tillier, stated that Tilton was an industry expert who lent credibility to SmartFi, and if "people believe in [Aaron Tilton] they believe in the project."

297.    Tilton's control, as CEO, thus, was evidenced by "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise…." 17 C.F.R. § 240.12b-2. As set forth above, SmartFi and its employees violated the Securities Act and, as CEO of SmartFi, Tilton had control over these primary violators in violation of 15 U.S.C. § 77o(a) and 15 U.S.C. § 78t(a)).

298.    As a consequence,  Tilton is personally liable under both Acts.

299.    Because SmartFi violated the Securities Act of 1933 and the Securities and Exchange Act of 1934 and, because Tilton controlled SmartFi, he may and should be held personally liable under both  the Securities Act of 1933 and the Securities and Exchange Act of 1934.

WHEREFORE, plaintiffs demand judgment in their favor and against Tilton and a rescission of the sale or return of their investments by way of return of their principal investment amount, interest, costs and such other and further relief as provided by the statute and/or as determined by the Court.

## **COUNT XII**

## **Unjust Enrichment against SmartFi**

300.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

116303315

301.    Unjust enrichment occurs when a benefit is conferred on defendant by plaintiff; the defendant appreciates that benefit; and defendant accepts and retains such benefit under circumstances that are inequitable for defendant to retain the benefit without payment of value.

302.    Plaintiffs delivered $1,868,261.46 to SmartFi, conferring a benefit on SmartFi.

303.    SmartFi has enjoyed the benefit by using Plaintiffs' funds to make loans and receive interest from customers, as well as potentially financing business operations.

304.    It is inequitable for SmartFi to retain this benefit under the circumstances without honoring the buy back guarantee which was discussed at length among the parties and advertised to the public.

WHEREFORE, plaintiffs demand judgment in their favor and against SmartFi for an amount in excess of $75,000, plus costs, interest, and such other and further relief as this Court deems just and proper.

## COUNT XIII

### Conversion against SmartFi

305.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

306.    Conversion occurs when a defendant deprives plaintiff of plaintiff's ownership or right of property, without the owner's consent, and without lawful justification.

307.    As pleaded above, Plaintiff's $1,868,261.46 was invested in SmartFi and their funds are identifiable via wire transfer records and public block chain ledgers.

308.    SmartFi wrongfully exercised control over Plaintiffs' funds after their buy back request were made in violation of their rights.

116303315

309.    SmartFi is willfully interfering with Plaintiffs' property rights by refusing to return their investments after the 12 month buyback period expired.

310.    SmartFi has no lawful justification for refusing to return Plaintiffs' investments in exchange for their SMTF tokens.

311.    Plaintiffs continue to be deprived of their investments of $1,868,261.46.

312.    Plaintiffs are entitled to immediate possession of their investment, along with interest for the months they were deprived of the value of their investment.  Plaintiffs are also entitled to an award of  punitive damages based on SmartFi's unreasonable, willful and wanton refusal to return their investment.

WHEREFORE, plaintiffs demand judgment in their favor and against SmartFi for an amount in excess of $75,000, plus punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

## COUNT XIV

### Trespass to Chattel against SmartFi

313.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

314.    Trespass to chattels occurs when a defendant intends to use or intermeddle with another's chattels without permission or justification and causes harm to or destruction of the chattel or causes a substantial interference with the possessor's use of the chattel.

315.    SmartFi has used Plaintiffs' investments to run the SmartFi platform and to loan money to its customers.

316.    SmartFi now refuses to return Plaintiffs' investments and is willfully interfering with Plaintiff's right to possess its investments after waiting for their 12-month buyback.

116303315

317.    Plaintiffs have suffered injury because they have been denied the use of their invested funds and are entitled to a return of their investment.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants and a return of their principal investment amount, interest, costs and such other and further relief as determined by the Court.

## COUNT XV

## Declaratory Relief against SmartFi

318.    Per Rule 10(c) of the Federal Rules of Civil Procedure, plaintiffs incorporate by reference the averments contained in the preceding paragraphs as if fully set forth herein.

319.    28 U.S.C. §151 provides that a Federal court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree…."

320.    There is an actual, present, and justiciable controversy between Plaintiffs and Defendants concerning SmartFi's legally enforceable obligation to return to plaintiffs their investment in SMTF tokens.

321.    Plaintiffs have a protectable interest in their in their investment in SmartFi SMTF tokens and have the right to judgment against SmartFi to afford the specific relief of returning their investment and interest.

322.    While SmartFi has not articulated any basis for its refusal and/or failure to return plaintiffs' investment in SmartFi tokens, SmartFi apparently claims to  have an interest adverse to plaintiffs in that SmartFi seeks to illegally retain plaintiffs' investment for its own purposes.

323.    The issues in this action, thus, are ripe for judicial determination.

116303315

WHEREFORE, plaintiffs demand judgment in their favor and against SmartFi in the form of a declaration entered against SmartFi that SmartFi must immediately return to plaintiffs their invested funds totaling $1,868,261.46 in exchange for the SMTF tokens held by Jason Brown and Daniel Stadelmann and the Buy Back Balance token held by Lynn Brown and Robert L. Brown, along with such other and further relief required to make plaintiffs whole as determined by the Court, plus costs.

Respectfully submitted,

/s/ Scott D. Cessar
Scott D. Cessar
Pa. I.D. No. 49639
scessar@eckertseamans.com
Matthew C. Gill
Pa. I.D. No. 315896
mgill@eckertseamans.com

ECKERT SEAMANS CHERIN & MELLOTT, LLC
U.S. Steel Tower, 44th Floor
600 Grant Street
Pittsburgh, PA 15219-2702
(412) 566-2581 (telephone)
(412) 566-6099 (facsimile)

John E. Bumbaugh
Pa. I.D. No. 49126
John E. Bumbaugh Jr.
Pa. I.D. No. 329157

BUMBAUGH GEORGE PLLC
10526 Old Trail Road
Suite 1
North Huntingdon, PA 15642
724-864-6840 (telephone)
jb@bumbaughgeorge.com
jeb@bumbaughgeorge.com

Dated: May 16, 2024                          *Attorneys for Plaintiffs*

116303315

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 16, 2024 I electronically filed the foregoing Second

Amended Complaint with the Clerk of the Court using the CM/ECF system, which will cause the

Second Amended Complaint to be served on counsel for the parties who are registered users.


*/s/ Scott D. Cessar*

Scott D. Cessar
*Counsel for Plaintiffs*

116303315