IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| JASON BROWN, DANIEL STADELMANN, LYNN BROWN, ROBERT L. BROWN, | ) ) ) ) | 2:23-CV-00554-WSH-CBB |
| Plaintiffs, | ) ) ) | W. Scott Hardy United States District Judge |
| vs. | ) ) ) | Christopher B. Brown United States Magistrate Judge |
| AARON TILTON, | ) ) ) | |
| Defendant. | ) ) | |

**REPORT AND RECOMMENDATION
ON MOTION TO DISMISS ECF NO. 61**

**Christopher B. Brown, United States Magistrate Judge**

## I.     Recommendation

This civil action was initiated on April 3, 2023, by Plaintiffs Jason Brown, Daniel Stadelmann, Lynn Brown and Robert L. Brown (collectively "Plaintiffs") against Defendant Aaron Tilton, the founder and CEO of cryptocurrency company Power Block Coin, LLC d/b/a SmartFi[1] ("SmartFi") alleging that SmartFi failed to honor a buyback agreement for Plaintiffs' investment in SmartFi's cryptocurrency and they seek return of the $1,868,261.46 invested with SmartFi.

---

[1]     SmartFi was originally named as a Defendant in the case.  After the filing of this lawsuit, SmartFi filed for bankruptcy.  The Court stayed the claims against SmartFi in accordance with the automatic stay provisions of 11 U.S.C. § 362.  Nothing contained in this recommendation shall be considered a recommendation or disposition of the matter on the merits as to SmartFi.

Presently before the Court is a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) by Tilton. ECF No. 61.  The motion is fully briefed and ripe for review. ECF Nos. 62, 71, 78.  This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

For the reasons that follow, it is respectfully recommended the Court deny Tilton's motion to dismiss for failure to state a claim in its entirety.

## II.    Report

### a.  Factual Background

#### i.    SmartFi's cryptocurrency and Plaintiffs' investment

The crux of Plaintiffs' complaint involves a dispute between Plaintiffs and Tilton regarding a right to a buyback guarantee for Plaintiffs' investment in SmartFi's cryptocurrency.

Jason Brown and Daniel Stadelmann are software developers who specialize in blockchain and cryptocurrency technology. ECF No. 48 at ¶ 14.  Lynn and Robert L. Brown are Jason Brown's parents. *Id.* at ¶ 66.

SmartFi offers loans in which borrowers receive money from SmartFi in exchange for posting cryptocurrency, including Bitcoin, as collateral. *Id.* at ¶ 16. SmartFi advertised that it would begin to sell SmartFi tokens called "SMTF" to the public and that these tokens were designed to be "speculative" and tied to SmartFi's success. *Id.* at ¶ 17.  SmartFi stated that it would raise funds by selling SMTF

tokens to customers in exchange for USDC stablecoin or United States Dollars, and therefore raised money from users by selling SMTF tokens and loaned that money to borrowers, whom it charged interest. *Id*. at ¶¶ 18-19.

Plaintiffs allege before they decided to purchase SmartFi's cryptocurrency, they relied on Tilton's promises in presentations, webcasts and conversations that the purchase of SMTF tokens came with a 100% buyback guarantee after twelve months. *Id*. at ¶ 27.  Based on these representations, Plaintiffs believed their investment in SmartFi would, if requested, be fully refunded by SmartFi, and they would be able to get their investment back even if SMTF's value did not appreciate. *Id*. at ¶ 30.  Plaintiffs collectively purchased $1,868,261.46 in SMTF tokens. *Id*. at ¶ 182.  After waiting one year, Plaintiffs requested a buyback of their SMTF tokens and SmartFi ignored and/or refused their request. *Id*. at ¶¶ 95-96.

On June 20, 2024, SmartFi filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Utah, Case No. 24-bk-23041-JTM. ECF No. 65.  The case against SmartFi was automatically stayed under 11 U.S.C. § 362. ECF No. 66.  Therefore, Tilton is the only active Defendant in this case.

### ii.    Representations by Tilton

Plaintiffs claim that Tilton assured Plaintiffs "on multiple occasions that SmartFi was built with 'safety first' and that the value of SmartFi tokens would not be exposed to the same fluctuations as other cryptocurrencies." ECF No. 48 at ¶ 24. Tilton also "stated on several occasion to [Plaintiffs]. . . that, even if the price of

SMTF did fall, investors could always invoke the buyback guarantee to get their initial investment back." *Id*. at ¶ 25.

Specifically, Tilton made these representations during an August 17, 2021 digital panel discussion when he "stated that a person can redeem his or her purchased SMTF tokens for their original purchase price at any time after holding them for one year[]" and that the "buyback allows SMTF token holders to either get all of their money back or hold the 'speculative value of the token.'" *Id*. at ¶¶ 35-36. Tilton stated the "SMTF token was a hedge for 'safety' to get back the original monies used to purchase the SMTF[]" and "emphasized that SMTF was built to start with safety and then provide for 'speculation.'" *Id*. at ¶¶ 37-38. Tilton represented SmartFi was not vulnerable to a "bank run" like traditional institutions because its "core economic design" only raised capital when there was a demand for loans. *Id*. at ¶ 40. Tilton explained SmartFi was "always sitting on cash" and "that's how we can do a buyback guarantee, we'll always have the cash available." *Id*. at ¶ 41.

During another virtual townhall meeting on September 16, 2021, that Plaintiff Jason Brown attended, Tilton reiterated there was a 100% buyback guarantee for SMTF tokens at the same price paid after one year. *Id*. at ¶¶ 42-43.

During a webcast in September 2021 that Plaintiff Jason Brown attended prior to his purchase of SMTF tokens, Tilton again stated the purchaser would have the choice of getting their money back or the speculative value of the token and claimed SMTF would be tied to the notional value of SmartFi's loan portfolio and

would stay "in balance." *Id*. at 44-46.  Tilton also stated SMTF was not a "security" within the meaning of the United States federal securities laws and because of that, SmartFi did not need to, nor planned to register SMTF with the Securities and Exchange Commission ("SEC"). *Id*. at ¶ 47.

During a SmartFi livestream on July 14, 2022, Tilton claimed SmartFi would return "exactly what you bought [SMTF] for." *Id*. at ¶ 50.  Tilton also promised SmartFi would have the liquidity to meet the buy back guarantee: "[N]eeding liquidity for defi projects, really it just all goes into our loan portfolio and that's what guarantees or backs the floor or the buy back guarantee of your original purchase price. . . ." *Id*. at ¶ 51.

During another SmartFi livestream on February 16, 2023, Tilton maintained the SMTF token is not a security because SmartFi does not pay interest on the token. *Id*. at ¶ 52.

In addition to having represented the buyback agreement in webcasts, Tilton had individual discussions with Plaintiffs Jason Brown and Daniel Stadelmann. *Id*. at ¶¶ 85-89.  Jason Brown and Stadelmann had a standing video call with SmartFi and its representatives, including Tilton every Monday in 2021 and 2022 during which they discussed software development work and later the purchase of SMTF tokens. *Id*. at ¶ 89.  Jason Brown and Stadelmann asked Tilton whether their purchase of SMTF would qualify for the 100% buyback guarantee, were told it would qualify, and their $1,858,261.46 investment would be fully refunded after one year if requested. *Id*. at ¶¶ 90-92.

Plaintiffs Lynn and Robert L. Brown learned about SmartFi's products through their son. *Id*. at ¶ 66.  Plaintiffs Lynn and Robert Brown reviewed SmartFi's websites and virtual video presentations which featured Tilton. *Id*. at ¶¶ 67-73.  Plaintiffs Lynn and Robert Brown "expected to receive their money back after 12 months and the[y] specifically invested because they did not want their investment to be at risk of loss in value like other cryptocurrencies." *Id*. at 74.

Plaintiffs maintain Tilton owns all of SmartFi's stock and all sales accrue to his benefit. *Id*. at ¶ 53.

### iii.    Plaintiffs purchase SMTF and SmartFi's failure to honor the buyback guarantee

On September 28, 2021, Plaintiffs Lynn and Robert L. Brown wired $10,000 to SmartFi in exchange for 7,751.94 SMTF tokens from SmartFi. *Id*. at ¶¶ 76-77. On January 4, 2023, after waiting the twelve-month period, Plaintiffs Lynn and Robert L. Brown invoked the buyback guarantee to have their money returned to their bank account, but SmartFi has not honored that request. *Id*. at ¶¶78-79.  On March 7, 2023, SmartFi removed the SMTF tokens from the Browns' account and credited them with an illiquid "Buy Back Balance" token. *Id*. at ¶ 80.

On October 12 and 13, 2021, Jason Brown and Stadelmann sent $1,858,261.46 worth of USDC stablecoin to SmartFi in exchange for SMTF tokens. *Id*. at ¶ 96.  After waiting over one year from the date of purchase, on January 9, 2023, Jason Brown and Stadelmann requested their investment back and SmartFi has since ignored or refused their request. *Id*. at ¶ 101.

### iv.    SmartFi's Self-Dealing Investments

In March 2022, SmartFi invested in a real estate project in Washington County, Utah through an unsecured promissory note that would not be paid back for a decade. *Id.* at ¶ 103.  SmartFi loaned $17.4 million of its customers' and investors' money to an affiliate entity called "SmartFi Toquerville LLC." *Id.* at ¶ 104.  SmartFi CFO Brad Jones signed the promissory note on behalf of SmartFi, while Tilton signed the note on behalf of SmartFi Toquerville LLC. *Id.* at ¶ 105. The money was then transmitted to a third party, Zions Landing LLC, who then gave it to The Wright Direction LLC in exchange for a 200-acre parcel of land. *Id.* at ¶¶ 106-07.  A separate promissory note was entered into between SmartFi Toquerville LLC and Zions Landing LLC which provided a six-month bridge loan to Zions Landing under which Zions Landing would pay back the $17.4 million in principal and $3 million in interest by September 2022. *Id.* at ¶ 108.  Payment was never made, and SmartFi Toquerville LLC foreclosed on the 200-acre parcel, now owns the land, and is owed over $14 million by Zions Landing. *Id.* at ¶¶ 109-111.

Plaintiffs claim that this failed real estate deal involved self-dealing and no due diligence was performed. *Id.* at ¶¶ 112-13.  Plaintiffs claim that Tilton hired a man who was previously indicted for real estate fraud to perform the due diligence and neither Tilton nor SmartFi investigated Zions Landings LLC. *Id.* at ¶¶ 114-117. Plaintiffs allege the land purchased was only appraised a value of $9 million. *Id.* at ¶ 113.  Plaintiffs further allege that the man who represented Zions Landing LLC was in bankruptcy when SmartFi Toquerville LLC funded the land purchase and

was the subject of several other bankruptcy filings as recently as 2013, 2017, 2018. *Id.* at ¶¶ 120-21.

Plaintiffs also allege that SmartFi extended a $2.1 million loan to its parent company Blue Castle Holdings, and that Tilton is a member of the board and receives a salary from Blue Castle Holdings. *Id.* at ¶¶ 130-31. The loan has never been memorialized and its terms, including interest rate, term or maturity date, remain unknown. *Id.* at ¶¶ 132-33. SmartFi has never received a payment on the loan. *Id.* at ¶ 134.

Plaintiffs further allege that Tilton may have spent SmartFi funds on personal expenses and company activities and not on the loan portfolio as promised. *Id.* at ¶ 144. For example, Tilton and his son have been riding Supercross for years as a personal hobby. *Id.* at ¶ 146. After the Plaintiffs invested, SmartFi became an official sponsor of Supercross racing, spending $675,000 on a sponsorship and incidental travel expenses to events and marketing. *Id.* at ¶¶ 145, 151. Tilton described in an interview that he was excited about the "access" he had to Supercross as a result of SmartFi's sponsorship. *Id.* at ¶ 147. Several SmartFi employees and consultants told Tilton that the Supercross sponsorship was not likely to be profitable and that it should not be pursued. *Id.* at ¶ 149.

Lastly, it's alleged that SmartFi's CFO Brad Jones stated that SmartFi did not separate the funds raised from selling SMTF tokens from other company money. *Id.* at ¶ 155.

8

### b. Standards of Review

#### i. Fed. R. Civ. P. 12(b)(6)

The applicable inquiry under Fed. R. Civ. P. 12(b)(6) is well settled. Under Fed. R. Civ. P. 8, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). Yet the court need not accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183–84 (3d Cir. 2000), or the plaintiff's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

A "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555.  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).  When considering a Fed. R. Civ. P. 12(b)(6) motion, the court's role is limited to determining whether a plaintiff is entitled to offer evidence in support of his claims.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)(overruled on other grounds).  The court does not consider whether a plaintiff will ultimately prevail. *See id.*  A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 178 (3d Cir. 2000).

### ii. Fraud Claims under Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* ("PSLRA")

Under Fed. R. Civ. P. 9(b), where a party alleges fraud, they "must state with particularity the circumstances constituting fraud" and "[m]alice, intent, knowledge and other conditions of mind of a person may be averred generally."  To meet this

standard, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

Actions brought under Section 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of both Fed. R. Civ. P. 9(b) and the PSLRA. *See e.g., Alberici v. Recro Pharma, Inc.*, No. CV 18-2279, 2020 WL 806719, at *4 (E.D. Pa. Feb. 14, 2020).

The PSLRA's pleading requirements are twofold: first it requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that "the complaint . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  The PSLRA's first pleading requirement requiring particularity "effectively subsumed" the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

### c. Discussion

Plaintiffs assert the following causes of action against Tilton[2]:

(1) A fraud in the inducement claim (Count II) ECF No. 48 at ¶¶ 183-191;

(2) A negligent misrepresentation claim (Count III) *id.* at ¶¶ 192-199;

(3) A violation of the 1933 Securities Act, Section 12(a)(2) (Count IV) *id.* at ¶¶ 200-215;

(4) A violation of the Securities Exchange Act Section 10(b) and Rule 10(b)(5) for material misstatements and omissions (Count V) *id.* at ¶¶ 216-234;

(5) Violations of the Pennsylvania Securities Act of 1972, 70 P.S. §§ 1-401 and 1-501 for selling securities through fraudulent and/or untrue statements (Count VI) *id.* at ¶¶ 235-250;

(6) Violations of the Utah Uniform Securities Act §§ 61-1-1 and 61-1-22 for selling securities through untrue statements (Count VII) *id.* at ¶¶ 253-271;

(7) Violations of the Utah Uniform Securities Act §§ 61-1-7 and 61-1-22 for selling unregistered securities (Count IX) *id.* at ¶¶ 279-287

(8) A violation of the Pennsylvania Securities Act of 1972 § 1-503 (Count X) *id.* at 288-293; and

(9) A violation of the Securities Act § 15 and Securities Exchange Act § 20(a) for control person liability (Count XI) *id.* at ¶¶294-299; *see also* ECF No. 71 at 1 n. 1.

SmartFi and Tilton filed the present motion to dismiss before SmartFi filed for bankruptcy, ECF Nos. 61-62, but before Plaintiffs responded to the motion to dismiss. In light of the automatic stay as to all claims against SmartFi, Plaintiffs styled their response brief to only respond to the arguments for dismissal of the

---

[2]     In the Second Amended Complaint, Plaintiffs make a total of fifteen claims against both SmartFi and/or Tilton. ECF No. 48 at ¶¶ 177-323. Several claims (Count I, VIII, XII-XV) are not included here as they were asserted against SmartFi, but are subject to the bankruptcy's automatic stay provisions. Thus, the only claims addressed are those that relate to Tilton.

12

claims against Tilton. ECF No. 71. Tilton thereafter filed a reply. ECF No. 78. Therefore, the Court will consider Tilton's arguments for dismissal for the claims asserted against him only.

Tilton moves to dismiss Plaintiffs' second amended complaint for several reasons. First, Tilton argues that Plaintiffs' claims for fraud in the inducement (Count II), and negligent misrepresentation (Count III) are barred by the economic loss rule and the gist of the action doctrine. ECF No. 62 at 9-16. Next, Tilton argues that Plaintiffs Section 10(b) and Rule 10b-5 Exchange Act claim fail under the heightened scrutiny of the PSLRA and Fed. R. Civ. P. 9(b). *Id.* at 19-24. Lastly, Tilton claims that Plaintiffs' Pennsylvania Securities Claims and Utah Securities Claims are barred as a matter of law. *Id.* at 24-28. Each argument is addressed in turn.

### i. Breach of Contract

As a preliminary matter, Tilton argues in his reply brief in support of the motion to dismiss – which was filed *after* the bankruptcy stay was imposed – that the Court should dismiss Plaintiffs' breach of contract claim against SmartFi. ECF No. 78 at 4-5. This argument should be summarily rejected, as Plaintiffs asserted the breach of contract claim against SmartFi alone, and not against Tilton, and the claim is subject to the automatic stay provisions of 11 U.S.C. § 362.[3]

---

[3] It is puzzling that Tilton seeks the Court to adjudicate a claim that is expressly stayed under 11 U.S.C. § 362 while he also argues that Plaintiffs are in violation of the automatic stay provisions by referring to "Defendants" or "SmartFi" in their response brief. Nevertheless, this Court does not construe Plaintiffs' response brief as seeking adjudication on any of the stayed claims – in fact, they

13

### ii.  Gist of the Action and Economic Loss Doctrines[4]

Tilton first argues that Plaintiffs' tort claims of fraudulent inducement (Count II) and negligent misrepresentation (Count III) are encompassed by Plaintiffs' contract claim and are therefore barred by the gist of the action doctrine. ECF No. 62 at 9-16.  In Pennsylvania, the "gist of the action" doctrine precludes plaintiffs from "recasting ordinary breach of contract claims as tort claims." *McShea v. City of Philadelphia*, 995 A.2d 334, 339 (Pa. 2010).  "The gist of the action doctrine provides that an alleged tort claim against a party to a contract, based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations." *Earl v. NVR, Inc.,* 990 F.3d 310, 314-15 (3d Cir. 2021) (applying Pennsylvania law) (cleaned up).

The second amended complaint does not, however, contain any breach of contract claims against Tilton and only alleges the tort claims of fraudulent inducement and negligent misrepresentation for Tilton's representations that Plaintiffs' purchase of SMTF tokens came with a buyback guarantee.  At this stage of the litigation, it is unclear what agreement if any the parties entered into and the

---

expressly make the point that they are not responding to stayed claims. ECF No. 71 at 4-5.  As previously stated, no recommendation will be made as to claims asserted against SmartFi.

[4]     The parties do not expressly indicate that Pennsylvania law applies to Plaintiffs' tort claims, but both cite to Pennsylvania law in their briefs. Accordingly, Pennsylvania law will be applied to Plaintiffs' claims for fraud in the inducement (Count II), and negligent misrepresentation (Count III).

essential terms thereof.  Given that, it is not clear whether Plaintiffs' claims are properly brought as a breach of contract or tort claims, and it is improper to dismiss Plaintiffs' tort claims based on the gist of the action doctrine. *Mill Run Associates v. Locke Prop. Co., Inc.*, 282 F. Supp. 2d 278, 290–91 (E.D. Pa. 2003) (rejecting arguments for dismissal of tort claims based on the "gist of the action" doctrine where it was "unclear" at the motion to dismiss stage whether the action sounded in contract or tort and the contractual terms were in dispute).  Accordingly, it is respectfully recommended that Tilton's motion to dismiss be denied in this respect.

Tilton likewise seeks dismissal of Plaintiffs' tort claims under the economic-loss doctrine.  Under Pennsylvania law, this doctrine precludes recovery for economic losses in tort actions where the party seeking recovery has suffered no physical or property damage. *Spivack v. Berks Ridge Corp.,* 586 A.2d 402, 405 (Pa. Super. 1991).  This legal principle was developed by courts precluding products liability tort claims in cases where only the product sustained injuries and the plaintiff suffered only economic losses. *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 n. 11 (3d Cir. 2001).  The Court of Appeals for the Third Circuit has implied that the economic-loss doctrine should be applied in products liability tort cases, while the gist of the action doctrine is better suited for non-products liability cases. *See id.*  Accordingly, because this is not a products liability case, this Court will follow suit and will not consider whether the economic loss doctrine applies to bar Plaintiffs' tort claims. *Indep. Warehouse Inc. v. Professori*, No. 15-1369, 2016 WL 1569210, at *4 (W.D. Pa. Apr. 19, 2016) (denying

15

motion to dismiss based on economic loss doctrine where no products liability claim was alleged) (collecting cases).  Thus, it is recommended that Tilton's motion to dismiss as it relates to the economic loss doctrine be denied as well.

### iii.  Fraud in the inducement and negligent misrepresentation claims and Fed. R. Civ. P. 9[5]

Tilton also argues that Plaintiffs' fraud in the inducement and negligent misrepresentation claims (Counts II & III) are inadequately pleaded under Fed. R. Civ. P. 9 because their allegations are "vague, conclusory, and lack any particularity as to time, reliance, and whether such statement or representations are indeed false." ECF No. 62 at 12; 11-15; 16.  The Court disagrees.

In Pennsylvania, fraud is considered "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1251 (Pa. Super. 1983) (citing *Frowen v. Blank*, 425 A.2d 412 (Pa. 1981)). "[F]raud may induce a person to assent to something which he would not otherwise have done[.]" *Delahanty,* 464 A.2d at 1251-52.

Plaintiffs' assert a claim of fraudulent inducement against Tilton.  Under Pennsylvania law such a claim has to contain the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely,

---

[5]      The heightened pleading standards of Fed. R. Civ. P. 9(b) apply to cases such as this one, which include fraudulent misrepresentation claims and negligent misrepresentation claims involving allegations of fraudulent activity. *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006); *Travelers Indem. Co. v. Cephalon, Inc.*, 620 Fed. Appx. 82, 85 n. 3 (3d Cir. 2015) (nonprecedential).

with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).

Plaintiffs also assert a claim against Tilton for negligent misrepresentation. In Pennsylvania, liability exists for negligent misrepresentation where

> (1) the defendant, in the course of his business or in a transaction in which he has a pecuniary interest, supplied false information with respect to that transaction or business; (2) the plaintiff justifiably relied on the false information in making a decision; and (3) the defendant was negligent in failing to exercise the reasonable care necessary in providing the information, that is, he either knew or should have known the truth or falsity of his representation.

*State Coll. Area Sch. Dist. v. Royal Bank of Canada*, 825 F. Supp. 2d 573, 584 (M.D. Pa. 2011); *See also Gibbs,* 647 A.2d at 890 (discussing and adopting Restatement (Second) of Torts § 552 governing negligent misrepresentation claims).

At this stage of the litigation, Plaintiff has pled sufficient information with respect to both claims.

As to Plaintiff's claims for fraudulent inducement, Plaintiffs allege that Tilton made several representations that SmartFi would buy back their SMTF tokens after one year for any reason to fraudulently induce Plaintiffs into buying the SMTF tokens. Plaintiffs plead these representations with specificity alleging that Tilton made the following representations:

17

- On August 17, 2021, Tilton made representations during a digital panel discussion that SMTF tokens can be redeemed for their original purchase price at any time after holding them for one year and token holders either get all their money back or can hold the speculative value of the token. ECF No. 48 at ¶¶ 35-36;

- During that same panel discussion, Tilton stated that SMTF tokens were a hedge for safety to get back the original monies used to purchase the tokens and the tokens were built to start with safety and provide for speculation, and SmartFi was not vulnerable to a "bank run" because it only raised capital when there was a demand for loans. *Id.* at ¶¶ 37-38, 40;

- During that same panel discussion, Tilton stated SmartFi was "always sitting on cash" and "that's how we can do a buyback guarantee, we'll always have the cash available." *Id.* at ¶ 41;

- On September 16, 2021, during another virtual townhall meeting, Tilton reiterated that there was a 100% buyback guarantee for SMTF tokens at the same price paid after one year. *Id.* at ¶¶ 42-43;

- In another September 2021 webcast, Tilton stated that the purchasers would have the choice of getting their money back or the speculative value of the token and claimed that the token would be tied to the notional value of SmartFi's loan portfolio and would stay "in balance." *Id.* at ¶¶ 44-46;

- During a livestream on July 14, 2022, Tilton again stated that SmartFi would return "exactly what you bought [SMTF] for" and that SmartFi would have the liquidity to honor the buyback guarantee. *Id.* at ¶ 51;

- In addition to the above, Jason Brown and Stadelmann had individual conversations with Tilton prior to buying SMTF tokens where they specifically asked Tilton whether their investment would qualify for the buyback guarantee and were told by Tilton that it qualified. *Id.* at ¶¶ 85-92.

Plaintiffs allege that Tilton's representation was false, as they all waited the one-year period and requested buybacks and SmartFi failed to refund their principal investment. At this juncture, Plaintiffs have also adequately alleged that they justifiably relied on the buyback guarantee because they believed purchasing SMTF tokens carried no risk given that they would be able to have their principal investment refunded to them. Lastly, Plaintiffs' have adequately alleged that their

18

damages were proximately caused by the reliance, because they did not receive any refund after waiting the one-year buyback period. These allegations are enough to "inject precision" into and substantiate their fraudulent inducement claims under Fed. R. Civ. P. 9(b).

As for Plaintiffs' negligent misrepresentation claim, Plaintiffs allege that Tilton, on behalf of SmartFi, gave Plaintiffs false information regarding SmartFi's buyback guarantee as set forth *supra* pp. 18-19, that Plaintiffs justifiable relied on Tilton's representations that their money was 100% refundable in deciding to purchase SMTF tokens, and Tilton was negligent in providing that information, as SmartFi's CEO and co-founder, knew or should have known that SmartFi would not or could not honor the buyback guarantee. It is also alleged that Tilton had a pecuniary interest in third parties purchasing SMTF tokens, as it is alleged he owns all of SmartFi's stock and all sales accrue to his benefit. ECF No. 48 at ¶ 53. Again, these allegations are enough to substantiate a claim for negligent misrepresentation under Fed. R. Civ. P. 9(b) and Plaintiffs have adequately pleaded a negligent misrepresentation claim.

Accordingly, it is respectfully recommended that Tilton's motion to dismiss be denied in this respect.

### iv. Plaintiffs' Federal Security Claims (Counts IV, V and XI)

Next, Tilton argues that Plaintiffs' federal securities violations claims (Counts IV, V and XI) fail for several reasons. First, Tilton argues that Plaintiffs' claims at Count V for violations of section 10(b) of the Securities Exchange Act, 15

19

U.S.C. § 78j ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5 have not met the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA. ECF No. 62 at 19-21. Next, Tilton argues that these claims fail because Plaintiffs have not adequately pleaded the scienter requirement for an Exchange Act claim. ECF No. 62 at 21-24. Lastly, Tilton argues that Plaintiffs' claims at Count IV for the violation of the Securities Act of 1933 section 12(a)(2), 15 U.S.C. § 77*l* (the "1933 Act") fail for the same reasons that Plaintiffs' other federal securities claims fail. ECF No. 62 at 24. Each argument will be addressed in turn

**1. Heightened Pleading Requirements of Fed. R. Civ. P. 9(b) and the PSLRA and Count V**

Plaintiffs bring claims against Tilton under Section 10(b) and Rule 10b-5 for his alleged misrepresentations regarding the buyback guarantee. ECF No. 38 at Count V.

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 was promulgated under section 10(b) and makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

20

To state a claim under Rule 10b-5, "a plaintiff must show that the defendant (1) made a misstatement or an omission of a material fact[;] (2) with scienter[;] (3) in connection with the purchase or sale of a security[;] (4) upon which the plaintiff reasonably relied[;] and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *Semerenko v. Cendant Corp.,* 223 F.3d 165, 174 (3d Cir. 2000) (collecting cases).  Actions brought under Section 10(b) and Rule 10b-5 are likewise subject to the heightened pleading requirements of both Fed. R. Civ. P. 9(b) and the PSLRA. *See e.g., Alberici,* 2020 WL 806719, at *4.

Tilton argues that Plaintiffs' allegations "lack specificity, particularity and connection to the misrepresentation and how they were relied upon and are ultimately false." ECF No. 62 at 23.  Not so.  Plaintiffs have alleged that Tilton represented on numerous occasions that SmartFi would buyback SMTF tokens for their purchase price after one year from the date of purchase. *See supra* pp. 18-19.  Despite requesting those buybacks after one year, SmartFi has failed to refund Plaintiffs' principal investment.  At this juncture, Plaintiffs have adequately alleged that they reasonably relied on Tilton's statements regarding the buyback guarantee because they believed purchasing SMTF tokens carried no risk given that they would be able to have their principal investment returned to them.  Lastly, Plaintiffs have adequately alleged that their reliance was the proximate cause of their injury because they did not receive any refund after waiting the one-year buyback period.  As stated *infra*, Plaintiffs have also sufficiently alleged scienter and the "in connection with the purchase or the sale of a security" element to state a

21

Rule 10b-5 claim.  Therefore, Plaintiffs have pleaded their Section 10(b) and Rule 10b-5 with sufficient particularity.

Next Tilton argues that "private securities claims include defenses of statements of opinion or belief, and statements that constitute puffery" and that the "PSLRA allows a defense for 'forward-looking statements' if accompanied by 'meaningful cautionary statements identifying important facts that could cause actual result to differ materially from those in the forward-looking statements." ECF No. 62 at 20.  Tilton does not identify which statements were mere puffery, nor does he argue why any such statements should be considered puffery, and his argument should be summarily rejected.

Tilton further seeks refuge under the "Safe Harbor" provision of the PSLRA. He argues that for "forward-looking statements," the PSLRA mandates that courts must consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement and he block quotes an alleged disclaimer set forth on SmartFi's website warning that digital trading currency could lead to financial loss. ECF No. 62 at 20-21.

The PSLRA contains a "Safe Harbor" provision, 15 U.S.C. § 78u-5(c), that "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya, Inc.*, 564 F.3d at 254.  To be sure, Tilton does not identify which statements he alleges are "forward-looking" and

22

instead attempts to immunize himself from liability by citing to a disclaimer on SmartFi's website about the risks of trading digital currency. Again, Tilton has not specifically identified which statements he made were "forward-looking," and at this juncture, whether the alleged disclaimer "accompanied" Tilton's "forward-looking" statements is yet to be seen.

Accordingly, it is respectfully recommended that Tilton's motion to dismiss be denied in this respect.

## 2. Scienter

Next, Tilton argues that Plaintiffs have not sufficiently alleged facts that state with particularity that Tilton acted with the requisite state of mind under the PLSRA. ECF No. 62 at 21-23. Tilton parses out seven paragraphs of the second amended complaint and argues that Plaintiffs have pleaded in a conclusory manner. *Id.*

In determining whether a plaintiff has alleged scienter, the court must accept all of the facts in the complaint as true and consider whether all the facts taken collectively give rise to a strong inference of scienter, and "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. The "scienter standard requires plaintiffs to allege facts giving rise to a 'strong inference' of either 'reckless or conscious behavior." *Avaya, Inc.*, 564 F.3d at

23

267(quoting *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999), abrogated on other grounds by *Tellabs, Inc.*, 551 U.S. at 323–34).  "Conscious behavior involves intentional fraud or other deliberate illegal behavior." *Dang v. Amarin Corp. plc*, --- F.Supp.3d ---, ---, No. CV 21-19212 (RK) (TJB), 2024 WL 4285900, at *24 (D.N.J. Sept. 25, 2024) (cleaned up).  "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (cleaned up).

Viewing a totality of the facts alleged, Plaintiffs have established a strong inference of scienter that Tilton's representations about the buyback guarantee were knowingly or recklessly false.  Tilton repeatedly promised that SmartFi would buyback the SMTF tokens at the original purchase price after one year of purchase for any reason. *See supra* at pp. 18-19.  Tilton maintained that SmartFi was able to honor the buyback guarantee because SmartFi was structured in a way that it would remain liquid, it was "always sitting on the cash," its core economic design did not include leverage and that it only raises funds when there is demand. ECF No. 48 at ¶¶ 41, 50-51; 220-224.  However, SmartFi invested over $17 million in an illiquid real estate deal with affiliated companies in March 2022 using investor's funds that eventually went sour and resulted in a defaulted loan within weeks of the originated loan and foreclosure on the land. *Id.* at ¶¶ 103-112.  Plaintiffs claim this deal was rife with self-dealing, because SmartFi loaned money to an affiliate

24

entity and Tilton signed the promissory note on behalf of the affiliate company. *Id.* at ¶105. Further Plaintiffs allege that SmartFi engaged in no due diligence before giving the loan and that if they would have done so, they would have (should have) known that the real estate's price was overinflated by millions of dollars, and that the deal involved potentially unsavory business dealings with bankrupt individuals and entities. *Id.* at ¶¶ 112-129. Plaintiffs also contend that SmartFi extended a $2.1 million loan with its customers' funds to its parent company, Blue Castle Holdings, of which Tilton is a board member and receives a salary from. *Id.* at ¶¶ 130-31. Plaintiffs contend this loan has never been memorialized, the terms, including interest rate, term or maturity date, are unknown, and SmartFi has never received a payment on the loan. *Id.* at ¶¶ 130-135. Further, Plaintiffs allege that Tilton, through SmartFi, spent customer funds on personal expenses or company activities, including $675,000 on a Supercross event sponsorship and related travel, because it was Tilton's personal hobby and he was excited about the "access" he had as a result of the sponsorship. *Id.* at ¶¶ 141-152. Plaintiffs also allege that SmartFi has at least 100 outstanding individual creditors to whom it owes a buyback guarantee. Id. at ¶ 139. These allegations proffer circumstantial evidence which demonstrate a strong inference that Tilton's statements – both about the buyback guarantee and how SmartFi was designed to maintain liquidity to meet those buyback requests - were at least reckless, which is enough to survive a motion to dismiss under the PSLRA. *Avaya, Inc.*, 564 F.3d at 269 (reckless statements are a

25

sufficient basis for scienter under the PSLRA).[6]  Tilton offers no opposing inference

for the Court to consider other than blanket denials of the allegations and general

arguments that Plaintiffs' allegations are conclusory and speculative. *See* ECF No.

62 at 23.  Accordingly, Plaintiffs have adequately alleged the scienter requirement

and it is respectfully recommended that the Court deny Tilton's motion to dismiss in

this respect.

### 3.  1933 Act Claim (Count IV)

Tilton argues that Plaintiffs' 1933 Act claims under Section 12(a)(2) (Count

IV) fails for the same reasons as Plaintiffs' Section 10(b) claim. ECF No. 62 at 24.

Because it is not recommended that the Court dismiss Plaintiffs' Section 10(b) claim

for the reasons argued by Tilton, it is likewise recommended that the Court

summarily deny Tilton's motion to dismiss on this ground.[7]

### v.  Plaintiffs' Pennsylvania and Utah Securities Claims (Counts VI, VII, IX, and X)

Next, Tilton argues that Plaintiff's Pennsylvania and Utah Securities Claims

at Counts VI, VII, IX and X fail for the same reasons their federal securities claim

---

[6]      These allegations also support an inference that Tilton had a motive via personal financial gain to make the statements about the buyback guarantee. *See Tellabs, Inc.*, 551 U.S. at 325.

[7]      Tilton also argues, albeit in a footnote, that because Plaintiffs' Section 10(b) and Section 12(a)(2) claims fail, their claim for control person liability based on the foregoing claims (Count XI) also fails as a matter of law and should be dismissed. ECF No. 62 at 24 n. 9.  Tilton cites to no legal authority for this proposition, and for that reason his argument can be summary denied. Notwithstanding, Plaintiffs have stated predicate claims under Section 10(b) and Section 12(a)(2), and it would be improper to dismiss Plaintiffs' claims for control person liability at this time.

fail because Plaintiffs have not met the heightened pleading requirement of Fed. R. Civ. P. 9(b). ECF No. 62 at 24-25; 26-27.

Claims under the Pennsylvania Securities Act, 70 P.S. §§1-401(a), 501(a) ("PSA") and Section 10(b) Exchange Act "have the same elements," and are treated identically. *See Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 659 (W.D. Pa. 1999) (collecting cases). *See also Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 713 (E.D. Pa. 2008).

Likewise, securities claims under the Utah Uniform Securities Act, Utah Code Ann. § 61-1-1 "are similar to" federal securities claims. *Tholen v. Ostler*, No. 2:07CV645DAK, 2008 WL 4446673, at \*5 (D. Utah Sept. 26, 2008) (finding that the same disputed facts present in the federal securities fraud claim precluded summary judgment on the Utah state law securities fraud claim as well). Therefore, because Plaintiffs have adequately pleaded claims for federal securities fraud, and the elements of Plaintiffs' securities fraud claims under Pennsylvania and Utah law do not differ from their federal claims, Plaintiffs have adequately stated securities claims under Pennsylvania and Utah law, and it is respectfully recommended that Tilton's motion be summarily denied in this respect.

### vi.   SMTF Token as a "Security" under Pennsylvania and Utah Law

Plaintiffs allege that Tilton sold unregistered securities in violation of Pennsylvania and Utah law. ECF No. 48 at Counts VII, IX.  Tilton argues that Plaintiffs have not adequately pleaded that SMTF is a "security" under either

Pennsylvania or Utah law because SMTF was not an investment contract and the related security claims – Counts VII, and IX – should be dismissed. ECF No. 62 at 25-26; 27-28.

In both Pennsylvania and Utah, it is a violation of state law to sell unregistered securities. 70 P.S. § 1-201 (Pennsylvania law); Utah Code Ann. 1953 § 61-1-7 (Utah law).

The United States Supreme Court found that an "investment contract" is a security interest where it involves "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946).  The Supreme Court therefore promulgated three requirements for establishing an investment contract: (1) "an investment of money"; (2) "in a common enterprise"; (3) "with profits to come solely from the efforts of others." *Id.* at 301.  The Supreme Court articulated that this definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

The Supreme Court of Utah has expressly adopted the *Howey* definition of an investment contract. *Payable Acctg. Corp. v. McKinley*, 667 P.2d 15, 18-21 (Utah 1983).  While the Supreme Court of Pennsylvania has not expressly adopted the *Howey* definition of an investment contract, several lower courts have, and it is likely that if faced with the question, the Pennsylvania Supreme Court would

28

likewise adopt the *Howey* definition of an investment contract. *Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 440 (Pa. Super. 2014) (applying the *Howey* test); *Martin v. ITM/Intl. Trading & Mktg. Ltd.*, 494 A.2d 451, 453 (Pa. Super. 1985) (same); *Schwalm v. Pennsylvania Securities Com.*, 965 A.2d 326, 332 (Pa. Cmmw. 2009) (same) (collecting cases); *Stas v. Pennsylvania Securities Commn.*, 910 A.2d 125, 129 (Pa. Cmmw. 2006) (same).

At this stage of the litigation, Plaintiffs have alleged sufficient facts to place the SMTF tokens within *Howey's* definition of investment contract.  Plaintiffs allege that they paid SmartFi for SMTF tokens to fund the common enterprise of SmartFi's lending platform. ECF No. 48 at ¶ 166.  Tilton represented that as SmartFi's loan portfolio grew, SMTF token buyers like Plaintiffs would benefit because the value of the SMTF tokens would increase as more interest was charged on the loans. *Id.* at ¶¶ 16, 19, 57, 62, 166, 175.  SmartFi managed the loan portfolio and Plaintiffs were led to expect profits by increasing the worth of the SMTF tokens solely through SmartFi's efforts to increase its loan portfolio. *Id.* at ¶¶ 161, 175, 303.  While Tilton argues SmartFi did not pay Plaintiffs, that the "value of SMTF token[s] will be realized from secondary markets" and SmartFi was engaging "in commerce" are all issues that require the benefit of a completed record and are inappropriate at this stage of the litigation.[8] Accordingly, it is respectfully recommended that Tilton's motion to dismiss be denied in this respect.

---

[8]    Tilton argues, again in a footnote, that because Plaintiff's Section 1-401 and Section 1-201 claims fail, Plaintiffs' claims against Tilton under Sections 1-501 and 1-503 (Counts VI and X)

### III.      Conclusion

For the foregoing reasons, it is respectfully recommended that the Court deny

Tilton's motion to dismiss ECF No. 61 in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72, the

parties have until **November 29, 2024** to file objections to this report and

recommendation.  Unless otherwise ordered by the District Judge, responses to

objections are due fourteen days after the service of the objections.  Failure to file

timely objections will constitute a waiver of any appellate rights.  *Brightwell v.*

*Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

Dated: November 15, 2024                    Respectfully submitted,

                                            s/Christopher B. Brown
                                            United States Magistrate Judge

cc:      Honorable W. Scott Hardy
         United States District Judge
         *via electronic filing*

         Attorneys of record
         *via electronic filing*

---

predicated on violations of the foregoing should also be dismissed. ECF No. 62 at 26 n. 10.  Tilton also argues in a similar footnote that because Plaintiffs' federal security claims fail, Plaintiffs' Section 61-1-1 and 61-1-7 claims fail and there are no predicate claims for control liability under 61-1-22 and that claim should also be dismissed. ECF No. 62 at 28, n. 11.  Tilton cites to no legal authority for these propositions, and for that reason his arguments can be summary denied. Nevertheless, Plaintiffs have stated predicate claims under Sections 1-401 and 1-201, and under Sections 61-1-1 and 61-1-7 and it would be improper to dismiss Plaintiffs' claims for control person liability at this time.